Filed 10/24/23  P. v. Chadhar CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SAJAWAL CHADHAR,<br><br>    Defendant and Appellant. | H047641<br>(Santa Clara County<br>Super. Ct. No. C1756832) |

A jury convicted defendant Sajawal Chadhar of the first degree murder (Pen. Code, § 187) of his wife, Leann Watson Chadhar.  On appeal, Chadhar makes three claims for reversal: (1) that the trial court incorrectly instructed the jury on the definition of "deliberation" required for first degree murder liability; (2) that the trial court erred by admitting evidence of his prior acts of domestic violence; and (3) that the prosecutor violated *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) by failing to disclose material information that would have impeached the credibility of the prosecution's forensic pathologist.  Finding merit only in Chadhar's claim of instructional error, we reverse the judgment, leaving the prosecution the election between reduction of the conviction to second degree murder or retrial.

# I.    BACKGROUND

In February 2017, the Santa Clara County District Attorney charged Chadhar with Watson's murder (Pen. Code, § 187).  Nearly two years later, Chadhar waived preliminary examination and was held to answer on the murder charge.[1]  At trial, Chadhar conceded that he killed Watson in a protracted assault with a metal oar.  The main disputed issue at trial was Chadhar's state of mind at the time of the killing— whether he killed Watson with express or implied malice, and whether malice, if proven, was either negated by provocation (for voluntary manslaughter) or aggravated by premeditation and deliberation (for the prosecution's sole theory of first degree murder).

## A.    *The Prosecution's Case*

### 1.    *Watson and Chadhar's Relationship*

Watson, a medical doctor, married Chadhar in January 2011 after a few months of dating.  After the wedding, the couple lived variously in Salinas, Grass Valley, and San Jose.  The couple's daughter, N., was born in August 2011.  Although Chadhar had been in college when he met Watson, he discontinued his education and largely stayed home. He told his mother, Naila Saman, that he hoped to earn money by getting sponsored to play video games.

Ellis Watson,[2] Watson's younger brother, never met Chadhar and did not meet his niece, N., until Watson died.  Ellis did not receive a formal invitation to Watson's wedding, and his frequency of contact with his sister diminished after she married.  Ellis sometimes indicated to Watson that he wanted to visit, but Watson would always tell him that she was in the process of moving or that her hours were long, and that she would get back to him about a better time to visit.  Ellis recalled that Watson once sent him a text

---

[1] The information is not included in the record on appeal.

[2] For clarity, we refer to Ellis Watson by his first name.

message that said, "I love you, you and [N.], my only friends in the world." Ellis texted back and asked her what was wrong, and she replied, "Nothing. Sorry." In the past, Watson told Ellis to be careful because someone was reading her messages.

Chadhar's mother, Saman, recalled that one time, Watson broke her hand and said that she had slipped in the shower. Another time, Watson called Saman and said she needed money because she had hurt her jaw.

### 2. Events Preceding Watson's Killing

Watson worked at Instant Urgent Care in San Jose for several weeks before she was killed. According to administrator Nicole Pitts, Watson was quiet and mostly kept to herself but would sometimes be on video chat during the workday. Watson once showed Pitts her phone, saying that Chadhar wanted to make sure Watson was safe. Chadhar, appearing by video on the screen, was "very angry" and "intimidating," and he demanded that Pitts give him her manager's phone number. Watson did nothing to stop Chadhar from yelling.

Watson once approached physician assistant Albert Usal with her phone, asking Usal to "tell him I'm at work." A loud male voice from Watson's phone was asking, "Who the fuck are you?" Watson told Usal to tell the man on the phone that Usal was gay.

About two weeks after Watson started her position at Instant Urgent Care, Chadhar called Rick Virk, the company owner. Chadhar complained that every time he called Watson, he heard her talking and laughing with another man. Chadhar accused Virk of "paying [Watson] to sit around and do nothing." Chadhar claimed to have a large social media following by which he could destroy the company's reputation if he wanted to. Concerned, Virk met with Watson the same day, and Watson authorized Virk to answer any questions Chadhar had about her activities. Watson subsequently requested

3

that Usal be reassigned to work at a different clinic on her workdays.  Watson told Virk that her husband was not comfortable with her working with Usal.

### 3. *Chadhar's Killing of Watson*

At 7:32 a.m. on February 2, 2017, Virk received a call from Watson's phone.  It was Chadhar, who said Watson would not be coming to work that day because she was unwell.  Virk asked to speak with Watson, but Chadhar said she was unavailable because "she went outside to get [Chadhar] a phone."

That same morning, at 7:59 a.m., Chadhar used Watson's phone to call Saman, reporting that Watson was unconscious and that he was unable to wake her.  Saman told Chadhar to call 911 and said she would drive to San Jose to join them.  Chadhar called Saman several times that morning, reporting that he was trying to perform CPR, that he had given Watson some water, and that she was coughing or possibly choking.[3]  Saman called 911 herself at 8:35 a.m.

"[E]arly morning, around maybe 8 or 8:30," a San Jose Fire Department crew was dispatched to the home in response to Saman's 911 call.  Chadhar answered the door about 30 or 40 seconds after several knocks.  Chadhar, frazzled, reported that "she can't breathe" and that "she choked on water."  Watson's obviously dead body was on the bathroom toilet, clad only in underwear; N. was playing in the same bathroom with some toys.

Asked multiple times what had happened to Watson, Chadhar never gave a clear answer.  Chadhar said that Watson had stopped breathing when she choked on water that he had given her.  Chadhar said that he then splashed water on Watson's face, looked up CPR instructions on YouTube, and called his parents.  Most of Chadhar's answers

---

[3] Saman's phone records reflected that she received a total of four calls from Chadhar's phone, the last call at 8:31 a.m.

4

indicated that whatever happened to Watson took place an hour before the fire crew's arrival, but Chadhar also said that some of the events had occurred the night before.

### 4. *Mobile Phone Evidence*

Data obtained from Watson's phone for the day of the killing indicated a web search for N.'s school at 7:32 a.m.; calls to Virk and N's school at 7:32 a.m. and 7:38 a.m., respectively; a Google search at 7:40 a.m. on whether a person is breathing or not breathing; and a search at 7:43 a.m. about CPR, or "unresponsive and not breathing, adult CPR," including a website with a video demonstration of CPR. The phone was used to call Saman at 7:59 a.m.

Data from Chadhar's phone disclosed that Chadhar sometimes texted Watson, "I want a divorce," "I don't love you," and "You're a random ho." When Chadhar texted her a Craigslist ad, saying he planned on moving out, Watson responded that she loved him. Watson expressed on other occasions that she loved Chadhar and that she was faithful to him, saying that "no woman or man touches me affectionately except you and [N.]" One time, Chadhar texted Watson, saying "Who's that," then "I can't see," and "Let me see around." To this, Watson responded, "CEO and medical director here. Will do carefully."

On one day in October 2016, Watson sent 547 text messages to Chadhar between 1:58 p.m. to 5:55 p.m., saying that she loved him, that Chadhar should call her, that he should not leave, and that she was sorry. Later that same afternoon, Watson texted Chadhar, "Pick up phone so know safe to come home," followed by, "Pick up phone or not coming home."

In January 2017, Chadhar texted Watson, "Go ahead. Ignore me now. You will have to face me." Watson responded the same day, "I am not ignoring you," and "I love

you more than life itself, Saj." Chadhar answered, "You can ignore me now, but you know you will not work tomorrow."[4]

###### 5. *Autopsy and Medical Examiner Testimony*

Dr. Michelle Jorden, the chief medical examiner at the Santa Clara County Office of the Medical Examiner-Coroner, testified as an expert in forensic pathology.[5] In her autopsy of Watson, Jorden found a total of 38 acute injuries inflicted at or near the time of death and 11 older injuries. Watson's acute injuries included rib fractures, a heart laceration and multiple "very destructive" avulsive injuries—involving "tearing of the tissue from the muscle"—comparable to "the types of injuries [seen] in motorcycle fatalities," all attributable to blunt-force trauma. According to Jorden, Watson also had a bleeding wound on her leg and abrasions on her face that appeared consistent with her face having been washed. Jorden also found evidence of manual strangulation, which decreases oxygen into and out of the brain.

Based on the injuries, Jorden opined that Watson died from multiple injuries, including strangulation, but Jorden could not determine whether it was the blunt-force trauma or the strangulation that ultimately caused Watson's death.

---

[4] From Watson's phone, an 82-page log of web searches between January 23, 2017, and February 2, 2017, and an 885-page log of texts and calls from January 25, 2006, through February 7, 2017, were admitted into evidence. From Chadhar's phone, a 58-page report with 924 text messages sent between Chadhar and Watson from March 2016 through January 31, 2017, and 103 pages of 1,568 text messages sent between Chadhar and Watson between February 12, 2015, and August 20, 2015, were admitted into evidence.

[5] Jorden testified that she was a member of the Child Abuse Prevention Council and the Domestic Violence Death Review Team. According to Jorden, the Domestic Violence Review Team is a multidisciplinary team involving multiple agencies where individuals come together to discuss deaths that have occurred and find ways to promote effective messaging to the community and offer education about domestic violence. Jorden had also lectured and presented in the area of domestic violence.

According to Jorden, it takes around four pounds of pressure to compress the jugular vein, about 10 pounds of pressure to compress the carotid artery, and about 33 pounds of pressure to compress actual airway of the neck structure, and, once the neck vessels are compressed, someone can lose consciousness within 10 to 20 seconds. Jorden testified that if pressure ceases, a person will regain consciousness within 10 to 20 seconds, whereas if pressure is maintained, a person's heart rate will "decrease" in about a minute. Evidence of bleeding in Watson's throat and swelling in her airway caused Jorden to believe there might have been multiple strangulation attempts during the altercation. According to Jorden, a person needs to be alive for swelling to occur. Jorden opined that there was a reasonable possibility that Watson was still conscious at the time the last application of force to her neck had ended, and it was reasonably possible that she did not have force applied to her neck until she died. But Jorden also considered it equally reasonable to infer that the application of force continued until Watson died. According to Jorden, if Watson had tried to drink water after experiencing manual strangulation, difficulty swallowing could have caused her to gag. But in Jorden's view, a report of someone's eyes rolling back before passing out would be more consistent with ongoing strangulation than with choking on water. She opined that a soft ligature might have been used to strangle Watson because there was a ribbed abrasion at the bottom of Watson's neck.

The evidence of older injuries Jorden found included broken ribs and a healing rib fracture. Although the rib fractures could have been consistent with a car accident, Watson also had an older "parry" fracture to her ulna, which Jorden opined was a defensive wound sustained in trying to defend and ward off blows. Jorden also found evidence of healing indicative of either prior episodes of blunt force trauma or a beating that persisted for hours.

7

Jorden opined that the laceration to Watson's heart was the result of either direct or indirect impact to the chest. Jorden did not see any evidence of a direct impact to the ribs or area of Watson's chest. According to Jorden, indirect force sufficient to cause a heart laceration could include blunt trauma to the abdomen that produced an acute rise in blood return to the right side of the heart. Jorden conceded that rough CPR could cause a heart laceration but deemed it "unlikely" here because she saw no other evidence of typical CPR injuries, such as anterior broken ribs. Jorden also considered it "rare" for CPR to cause a heart laceration, an occurrence she had observed only a "handful" of times.

An e-mail exchange with defense expert Dr. Terri Haddix on whether indirect forces could have caused the heart laceration did not change Jorden's opinion. Haddix e-mailed that the "ed notes" of the textbook Jorden had relied on for her indirect-forces theory were inapplicable. Jorden did not review the articles that Haddix sent because it would not "change [Jorden's] opinion on the case." Jorden conceded that she had not found any published research that described a heart laceration caused by indirect forces in the same location with the same associated abdominal injuries as in Watson's case.

Jorden could not identify a precise time of death. From photographs taken when medical examiner staff took custody of the body, Jorden opined that Watson appeared to be at the peak of rigor mortis, which can occur anywhere from 12 to 24 hours after death. Watson's body was transferred from the police to medical examiner staff at approximately 8:30 p.m. on February 2.

### 6. *Chadhar's Prior History of Domestic Violence*

#### a. *Miners Clinic Staff (2011-2014)*

The prosecution called six witnesses from the Miners Clinic in Grass Valley, where Watson worked between 2011 and 2014. Within the first year after N. was born, Watson broke her arm and claimed she had fallen in the shower, but colleagues found

8

implausible her explanation of how the injury occurred. Chadhar called Watson with intrusive frequency while she was working: he could be heard yelling and saying things that sounded "very threatening and scary" and sometimes called repeatedly to the point that Watson would have to leave a patient to answer the phone. Watson would have to leave work early at times in response to calls that visibly frightened her, and she was sometimes an hour or two late returning from lunch. Watson went home for lunch every day to cook for Chadhar and help take care of N., although she lived 30 minutes from the clinic. Sometimes Watson brought N. to work, including upon her return from lunch, explaining that Chadhar "can't handle a baby."

Watson sometimes came to work with visible bruises—on her arm, her eye, and the area of her jaw and neck. Watson would try to cover her injuries, and when asked if she was okay, she would just nod and say yes.

One time it looked like her finger was in pain and she was wearing a splint. Another time, Watson looked like she was favoring one side while walking, and when asked, Watson claimed to have walked into a door. Watson either minimized her injuries or attributed them to an accident.

Watson seemed to have "incredibly low self-esteem" and was often apologetic in meetings and other situations. Watson sometimes called in sick either a few minutes before she was supposed to start work or after her scheduled start time. Watson rebuffed all offers of help and expressions of concern and said she was just tired.

Watson abruptly stopped working at the clinic and moved, but before she left, two assistants separately broached with her the topic of her home life. Watson told one that she was moving because Chadhar did not want to live in the area anymore, and he wanted to be closer to his family and friends. Reminded that she was the one making money and could choose not to move, Watson said only that Chadhar was a good father. Urged by another assistant to leave Chadhar for her safety, Watson replied only, " 'I can't; I have to

go"; she also said, " 'Well, I'm older. I'm not that attractive. I can't get someone else. I could never find another man.' "

Watson's appearance changed as she worked at the Miners Clinic. Novak described Watson, when she first started, as well kempt and nicely dressed. Over time, Watson started to look frail and tired—she sometimes wore ripped clothes or clothes that were too big, she did not look people in the eye, and her hair would be askew.

Several weeks after leaving the clinic, Watson called to request insurance information, saying that she had tripped over a packing box and had broken her jaw in two places.

### b. *Mayview Clinic Staff (2014 – 2016)*

The prosecution called three witnesses from the Mayview Clinic, where Watson worked between 2014 and 2016. On several occasions, Watson came to work with visible injuries—a black eye, broken shoulder, broken glasses, bruises on her forehead, bruises on her arms, and a burn on her hand. One staffer noticed the injuries appeared following days that Watson called in sick. Whenever she called in sick, Watson would always be crying, saying she was unable to come to clinic that day, always with a man's voice in the background telling her what to say. When at work, Watson would have an open call on her phone during meetings with staff and her supervisor, and she would ask her supervisor to confirm audibly when her shift would end for the day. Watson always had her phone "glued" to her hand and was always talking to Chadhar, typically by video. Watson would hold her phone in a way that made it appear like she was showing someone on the other line the medical facility. Watson could frequently be heard apologizing over the phone, and she would be on the phone even while actively treating patients. Once, Watson was crying and telling someone over the phone, " 'I will – Please don't leave me. Please don't leave me. I will order different food for you.' "

When talking to Chadhar, Watson would describe what she was doing—she would tell him that she was walking into a room with a patient, and she would identify the people in the room to Chadhar. Watson explained to one colleague that her husband forbade her to touch patients and was on video chat to monitor her compliance. Advised against her phone use, Watson said that she "ha[d] to" continue to video chat with her husband. One time, when Watson's phone battery died in a middle of a video chat, Watson became distressed. Chadhar then called the clinic. Although Chadhar was "always" cursing at Watson, Watson never got angry or fought back with Chadhar; she always seemed scared.

Watson was warned by the clinic's chief medical officer that it was a privacy violation to record her interaction with patients. But Watson persisted in using her phone and was eventually terminated as a result.

### c. *Social Worker Visit (2016)*

A few months before Watson's death, Santa Clara County social worker Gadise Tadesse made an unannounced visit to Watson and Chadhar's home. Tadesse and a coworker knocked on the door, and a man she believed was Chadhar said, "There is no child abuse here" and instructed Tadesse and her coworker to leave their business cards at the door. Tadesse left a voicemail message, to which Watson responded, saying she wanted to meet at the house in Chadhar's presence.

Several days later, Tadesse went back to the home with a different coworker. Attempting to speak to Watson privately in the living room, Tadesse had Chadhar and N. leave the room, but Tadesse could "kind of hear [Chadhar] standing in the hallway." A few minutes into Tadesse's conversation with Watson, Chadhar returned to the living room, yelling. Tadesse tried to defuse the situation, but Chadhar continued to yell, even after N. emerged her room. Tadesse decided it was unsafe to stay, so she asked Chadhar to let her and her coworker leave. Watson did not show "any emotion [or] anger or

11

anything" and said nothing to Chadhar. Chadhar continued "yelling and screaming" at Tadesse and her colleague as they left.

### 7. *Intimate Partner Violence Expert*

Richard Ferry, a licensed marriage and family therapist, testified as an expert in intimate partner violence. Ferry described abusive behaviors characteristic of intimate partner violence, including financial abuse, isolation of the victim, verbal and emotional abuse, threats, harassment, and stalking, as well as physical and sexual abuse.

Ferry characterized isolation—limiting a victim's contact with others—as a means of monopolizing a victim's perceptions, inhibiting any "dawning awareness" of the wrongful nature of the perpetrator's conduct.

According to Ferry, stalking or harassment extends to requiring the victim to live chat during the entire day at work, which causes the victim to limit activity that might anger the abuser.

According to Ferry, "coercive control" is a continuing course of conduct by which an abuser causes the victim to internalize the abuser's values, beliefs, and preferences, and often to anticipate and comply with the abuser's wishes without being told. This effect of coercive control Ferry described as "traumatic bonding."

Ferry opined that victims may develop "toxic hope"—the persistent belief and hope in the abusive relationship despite contrary evidence—by normalizing or rationalizing the abuse, trying to believe that the abuse is manageable or else attributable to the victim's own sense of being fundamentally flawed or worthless. In Ferry's view, victims experiencing toxic hope continue to assure their abuser of their love, that they do not want the abuser to leave them, and that they will do whatever the abuser wants to make them happy.

12

According to Ferry, a victim may remain in an abusive relationship despite being financially self-sufficient and may return to an abuser an average of five to seven times before making a final break, commonly refusing help in the process.

**B.**     *The Defense*

**1.**     *Chadhar*

Chadhar met Watson, 13 years his senior, after she contacted him through a social networking and dating website. Chadhar did not initially want to get married and made excuses, saying that he could only marry another Muslim. But Watson converted to Islam, and they married a few months after they started dating, when Chadhar was 21 years old.

Watson's family did not approve of their marriage and called Chadhar a juvenile and a terrorist. After they married, Chadhar quit his retail job and applied for educational programs. Watson, however, opposed his attending community college because she worried that he would meet someone younger and leave her. Chadhar had his own insecurities about relationships, and a prior girlfriend had cheated on him. Instead of working or going to school, Chadhar stayed home and tried to make money by playing video games.

Because Watson wanted to pursue her career as a medical doctor, she wanted Chadhar to stay home to take care of N. Watson would come home during her lunch breaks to help Chadhar with N., and Chadhar would cook for Watson. Watson did not spend time with anyone aside from Chadhar, N., and Chadhar's family. Although Watson earned all the money, she put her salary into two bank accounts, one in Chadhar's name and the other in her own name.

Chadhar never physically abused Watson until the day he killed her. While living in Grass Valley, Watson got into several car accidents, including once driving her car into a tree. Another time, Watson hurt her arm in the bathroom while taking a shower.

13

Watson would occasionally get into other accidents outside of Chadhar's presence. Watson had problems with a dentist at one point, but Chadhar did not remember her breaking her jaw. Sometimes, the couple would yell at each other and fight, and Chadhar would often call Watson names. Watson sometimes took N. to work when Chadhar was unable to handle N.'s crying, and Watson wanted to give him a break.

Chadhar was lonely when Watson went to work, so they communicated by Skype—often with only the audio on—so that Chadhar would be able to hear Watson while he played video games. While on video chat, Chadhar and Watson would sometimes send each other text messages to get each other's attention. Chadhar denied that he was monitoring Watson's movements: they both simply liked to remain "connected" all day. Chadhar often called Watson to ask her to come home as soon as she was done with work. Chadhar would also threaten to leave or divorce Watson, sometimes over matters such as disliking the food that she ordered for him.

The year before he killed Watson, Chadhar became increasingly suspicious that Watson was cheating on him. Tensions arose when Chadhar learned that Watson had falsely told him her medical assistant was female, not male. Chadhar became even more suspicious when Watson said her medical assistant was gay, which turned out to be untrue. Chadhar spoke with Usal, Watson's assistant, and was calm when he asked Usal to confirm his sexual orientation. Believing Watson was hiding more from him, Chadhar contacted Virk.

The eve of the killing, Chadhar had a nightmare in which Watson admitted having cheated on him with numerous men. Around 6:30 or 7:00 a.m., Chadhar woke, upset, and confronted Watson about the dream. Watson tried to reassure him, but Chadhar insisted, "I don't want to hear it. I know you cheated on me because you told me in my dream." Watson offered him her phone so that he could inspect it for proof of her fidelity. Chadhar knocked the phone into Watson's face.

14

Chadhar told Watson he wanted a divorce and took away her rings, which he put in the garbage. Watson continued to protest that she had not cheated on him. Chadhar picked up a metal oar, telling Watson he did not want to hear anything but the truth. At this, Watson then responded that that she had cheated on him several times.

Chadhar started swinging the oar "as hard as [he] could," striking Watson multiple times. While Chadhar was hitting her—her thigh, her buttocks, her torso—Watson just stood with her arms in front of her, as if bracing herself, saying, "I can take this."

Watson eventually collapsed, however, and was lying on her back when Chadhar got on top of her and pushed the oar against her neck with his full 230-pound body weight. He lifted the oar, but Watson said nothing, so he pressed it on Watson's neck a second time. While pushing, Chadhar said, "Tell me the truth. I'd rather hear that you didn't cheat on me than you did cheat on me." Chadhar was angry but did not strangle Watson longer than it took to repeat his demands that Watson tell him the truth. Watson had her hands under the oar and was trying to push back against it, but Chadhar was stronger than her. When Chadhar released the oar a second time, Watson said, "Saj, all right. I'll tell you. I didn't do it. I didn't cheat on you."

At that point, Watson was still breathing and was able to apologize to Chadhar. She was bleeding. Chadhar left the room with Watson's phone to call Virk.

After telling Virk that Watson would not be coming to work, Chadhar returned to find Watson sitting with blood pooling around the bed and the wall. When Chadhar helped her up, she fell back onto the mattress on the floor. Chadhar left a message for N.'s school, saying that N. would be absent that day. He then tried to give Watson some water, but she spit it out and her eyes rolled back into her head.

Chadhar looked up how to do CPR and attempted CPR until he was sweating and unable to continue. He was unsure whether her heart was beating. Amid his efforts to

15

revive Watson, he called his mother, but he did not call 911 because he knew he had killed Watson and was afraid of the police.

Chadhar heard crying from down the hallway and saw N. approaching. Chadhar closed the door, but N. slid underneath the door a drawing captioned, "I love mom." So Chadhar asked N. to try, vainly, to wake her mother.

When Saman told Chadhar she was coming for N., Chadhar washed his clothes, took a shower, retrieved the rings from the trash, and replaced them on Watson's fingers. He also put the metal oar in the laundry room.

Chadhar denied intending to kill Watson or believing he was doing so. Chadhar denied knowledge of how Watson sustained some of the older injuries Jorden noted during the autopsy.

### 2. *Dr. Terri Haddix*

Dr. Terri Haddix testified as an expert in forensic pathology, anatomic pathology, and neuropathology. Haddix opined that Watson died due to the inability of her body to deliver oxygen to the heart and the brain. According to Haddix, this was due to the injury and swelling of the soft tissue of Watson's upper airway.

Haddix opined that the swelling in the airway could have been the result of Watson continuing to breathe after a second application of force using the oar. Haddix found nothing in the evidence that would show that the application of force against Watson's neck continued until she died, because the swelling present required Watson to have survived for at least several minutes after release. Haddix testified that the swelling could also be consistent with the second strangulation occurring after a longer interval, such as 30 minutes or one or two hours. Haddix did not observe any evidence that a soft ligature was used: the "ribbing-type pattern" observed on Watson's neck could have been the result of a hard object pressing against a garment with that pattern.

16

According to Haddix, the heart laceration could have been caused by the administration of CPR either before or after Watson died. Haddix did not agree with Jorden's conclusion that indirect forces could have caused the heart laceration. Having reviewed the literature Jorden relied on for this theory, Haddix did not believe the articles described mechanisms resembling the current case.

Haddix identified only two petechial hemorrhages, which can form when pressure is placed on the veins at the front sides of the neck, and being strangled by an object that does not bend around the neck does not necessarily cut off the veins. Haddix opined that fewer petechial hemorrhages suggested a shorter duration of strangulation.

## C.    *The Verdict, Motion for a New Trial, and Sentencing*

The jury convicted Chadhar of first degree murder. Defense counsel moved for a new trial, arguing that the trial court had erred by giving the jury an erroneous definition of "deliberation" in response to a jury question, the prosecutor had committed *Brady* error by failing to disclose evidence material to Jorden's credibility, and the evidence of intent to kill and premeditation and deliberation was insufficient to support the conviction. The trial court denied Chadhar's motion for a new trial and sentenced him to an indeterminate term of 25 years to life in prison.

## II.    DISCUSSION[6]

As we will explain, the trial court committed a crucial error when answering the jury's request to clarify the mental state required for first degree premeditated murder, and we are unable to rule out prejudice as to the degree of murder.  Because we reject Chadhar's other claims of error, the prosecution on remand may elect between accepting a reduction to second degree murder or retrial on the greater offense.

### A.    *Instructional Error*

The trial court initially instructed the jury in accordance with CALCRIM No. 521, the pattern instruction on first degree murder, limiting the instruction to the prosecution theory of premeditation and deliberation:[7] "The defendant Sajawal Chadhar is guilty of first-degree murder if the People have proved that he acted willfully, deliberately, and with premeditation.  The defendant Sajawal Chadhar acted willfully if he intended to kill.  The defendant Sajawal Chadhar acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.  The defendant Sajawal Chadhar acted with premeditation if he decided to kill before

---

[6] After briefing in this case was completed, Chadhar filed an application for leave to obtain a settled statement, seeking to include in the record on appeal certain exhibits that were admitted into evidence at his trial but were unable to be located by the trial court clerk.  Chadhar specifically requested the following exhibits:  (1) transcripts and recordings of the 911 call made by Saman, the body-worn camera footage of Chadhar at the scene, Saman's prior interview with the police, Mehta's prior statements; (2) cell phone extraction reports, including text messages; and (3) unredacted memoranda that impeached Dr. Jorden's credibility.  After reviewing Chadhar's appellate arguments, we conclude that the exhibits are not necessary for us to resolve his claims (as we discuss, *post*, footnote 21, we have taken judicial notice of the unredacted memoranda impeaching Jorden from records that were filed in connection with an unrelated case).  Accordingly, we deny Chadhar's application to settle the appellate record.

[7] Given the prosecution's choice of theory, the trial court omitted from CALCRIM No. 521 the elements of all other theories of first degree murder.

18

completing the acts that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. . . . A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." During deliberations, however, the jury made the following request:[8]

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff,

vs.

Case #C1756832

@ .of what?

SAJAWAL CHADHAR,

_____ Defendant.

We, the jury in the above entitled cause, request the following:

Clarification of sentence on page 521 paragraph 1, sentence 3. "The defendant Sajawal Chadar acted deliberate if he carefully weighed the Consideration for and against his choice and, knowing the consequences decided to kill." What is meant by choice. and consequeces

Date: 5/7/2019          Juror Seat #: 5

The act of beating & strangl

RESPONSE:

---

[8] Another question the jury had about CALCRIM No. 521 was: "The difference between sentence 2 and sentence 4 on page 521 'First Degree Murder' paragraph 1." The trial court answered the question by stating: "Sentence 2 of paragraph 1 in the 521 First Degree Murder instruction is the definition of the term 'willfully.' The #4 sentence of that same paragraph is the definition of the term 'acted with premeditation.' The[se] are two separate requirements of First Degree Murder."

19

Defense counsel asked the trial court to instruct the jury that the "choice" referred to in CALCRIM No. 521 was "the choice to kill" and proposed that the court instruct the jury in accordance with CALJIC No. 820, the predecessor to CALCRIM No. 521: "To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice, and having in mind the consequences of his proposed course of action . . . decides to, and does, kill." The trial court, however, adopted the prosecution's proposal and instructed the jury that "choice" refers to a "chosen course of action" and "consequence" refers to the "consequences of the chosen course of action."

Chadhar argues that the trial court misstated the law in responding to the jury's question, thereby permitting the jury to convict him of first degree murder without a finding that he deliberated on the choice to kill Watson. We agree and conclude that the instructional error was prejudicial.

### 1.    *Legal Principles*

Because "[a]ll criminal defendants have the right to 'a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt,'" the trial court has a sua sponte duty to instruct the jury on all the essential elements of a charged offense. (*People v. Merritt* (2017) 2 Cal.5th 819, 824.) A failure to do so threatens the state and federal constitutional right to a jury trial. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16.) Moreover, if the jury during deliberations "desire[s] to be informed on any point of law arising in the case, . . . the information required must be given" by the trial court. (Pen. Code, § 1138.) The trial court "has 'a " 'mandatory' duty to clear up any instructional confusion expressed by the jury. [Citations.] This means that a trial court's response to a jury question can be erroneous even if it does not technically misstate the law." (*People v. Fleming* (2018) 27 Cal.App.5th 754, 766 (*Fleming*).)

20

As with the trial court's initial instructions, the correctness of the trial court's response to a jury's request for supplemental instruction "presents a question of law that we review de novo." (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887, fn. 4.) We examine the challenged instruction "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229 (*Houston*).)

**2.      *Analysis***

On appeal, Chadhar argues that the trial court erred in its answer to the jury's question because a first degree murder conviction requires that the defendant deliberate over a decision to kill, and the element of deliberation is not satisfied by a deliberation over a lesser "course of action" such as an assault "even if the defendant ultimately does kill intentionally."

Murder is "the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).) Available theories of first degree murder liability include murder "perpetrated by . . . willful, deliberate and premeditated killing." (Pen. Code, § 189, subd. (a).) To be "deliberate," the murderer must have engaged in a "careful weighing of considerations in forming a course of action." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*), italics omitted; *People v. Solomon* (2010) 49 Cal.4th 792, 812; *People v. Pearson* (2013) 56 Cal.4th 393, 443.) However, the "course of action" subject to the required deliberation is no less than the act of killing—"the killer must act deliberately, carefully weighing the considerations for and against a *choice to kill* before he or she completes the acts that caused the death." (*People v. Chiu* (2014) 59 Cal.4th 155, 166 (*Chiu*), italics added, superseded by statute on other grounds as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3.)

21

As indicated, the jury was instructed under CALCRIM No. 521 that Chadhar "acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill." We find no fault with the pattern instruction as a general proposition: a reasonable interpretation of this instruction is that the "choice" and "consequences" are the choice to kill and the consequences of the choice to kill. But here, the jury indicated its confusion as to whether the references to "choice" or "consequences" signified the assaults Chadhar admittedly perpetrated on Watson, as opposed to her killing. In other words, the jury sought clarification on whether the element of deliberation could be satisfied by Chadhar deliberating only on his decision to beat and strangle Watson, as opposed to deliberating on the choice to kill her.

By tautologically instructing the jury only that "choice" referred to Chadhar's "chosen course of action" and failing to plainly state that the course of action must be the choice to kill, the trial court failed to address the jury's explicitly identified point of confusion. The Attorney General argues to the contrary that the trial court's response necessarily clarified to the jury that Chadhar could *not* have "deliberated" within the meaning of the instruction if he only carefully weighed the considerations of the "beatings and strangulation." But by assuming that the jury would necessarily include in the "course of action" the act of killing, the Attorney General disregards the plain language of the jury's question and its clear contemplation that the "choice" might be limited to the decision to engage in "the act of beating and strangling."

That the California Supreme Court has defined "deliberation" with the same language as instructed here—as a "careful weighing of considerations in *forming a course of action*" (*Koontz*, *supra*, 27 Cal.4th at p. 1080)—does not alter our analysis: given the jury's apparent bewilderment on this point, the trial court was obliged to clarify that the *choice* should be the choice to kill (as distinct from the choice to commit the act

22

that eventually causes death), and that the *consequences* the deliberator must bear in mind in contemplating that choice should be the consequences of that decision to kill. (See *Chiu*, *supra*, 59 Cal.4th at p. 166; *People v. Daugherty* (1953) 40 Cal.2d 876, 901-902 [for first degree murder, " 'the slayer must weigh and consider the question of killing and the reasons for and against such a choice' "]; *People v. Anderson* (1968) 70 Cal.2d 15, 26 (*Anderson*) [killing with malice aforethought requires that intent to kill be " ' "formed upon a *pre-existing* reflection" ' " and slayer must have killed " ' "as a result of careful thought and weighing of considerations" ' "]; *People v. Cordero* (1989) 216 Cal.App.3d 275, 283 ["consequences" are those that "flow[] from the act of killing"].) Instead, the trial court's supplemental instruction effectively reaffirmed the jury's belief that a deliberate killing does not necessarily require careful consideration of a choice to kill, but only a choice to beat and intermittently strangle Watson.

The trial court's response to the jury question was not mitigated by anything in the prosecution's argument (nor could it have been, given its timing). (See *People v. Young* (2005) 34 Cal.4th 1149, 1202 [reviewing court must consider arguments of counsel in assessing probable impact of the instruction on the jury].) Instead, the response amplified confusion introduced by the prosecutor's reliance in closing argument on implied malice. The prosecutor first defined "implied malice" for the jury, explaining that it is "the commission of an intentional act that the defendant – that the consequences of the act that he was committing were dangerous to human life and at the time he committed that, he had knowledge of the danger and conscious disregard to human life." In particular, the prosecutor pointed to Chadhar's own statement that he had put his entire weight down on the metal oar when it was pressed against Watson's neck as evidence of implied malice. The prosecutor immediately went on to define first degree murder—specifying that to "deliberate" means to "decide[] to act" after "thoughtful and consideration for or against a choice." Taken in isolation, the prosecutor's various arguments did not misstate the

23

law.  But as the jury's later question made clear, the prosecution's juxtaposition of these disparate elements led the jury to conflate the required elements to the point that the "act" upon which an accused must have deliberated to be guilty of first degree murder was not necessarily the act of killing but the strangulation that produced the fatal swelling of Watson's airway—whether or not Chadhar intended that fatal result.  Under this erroneous theory, the killing of Watson was "deliberate" for first degree murder liability so long as Chadhar carefully considered the "act" of bearing his weight down on Watson's neck.

The Attorney General argues that the next paragraph in CALCRIM No. 521, which expressly states that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated," negates any risk of the jury finding it sufficient for Chadhar to have deliberated only on the beating and strangulation, before rashly deciding to kill Watson.  Yet as Chadhar points out, this proposition is one of exclusion:  it merely describes a killing that is *not* deliberate or premeditated and does not serve to define the minimum requisites of a killing that *is* deliberate.  And here, given its confusion over the term "choice" and the trial court's subsequent instruction that "choice" is merely a generic "course of action," it is reasonably likely that the jury understood the instruction as basing first degree murder liability on a choice to engage in assaultive conduct with conscious disregard for the attendant danger to life and a decision to kill, without a careful weighing of the choice to kill and a consideration of the consequences of the killing.

Accordingly, we conclude that the trial court erred when it instructed the jury on the meaning of "deliberation," as there is a "reasonable likelihood the jury applied the instruction in an impermissible manner."  (*Houston*, *supra*, 54 Cal.4th 1186, 1187 & 1230.)  Although the trial court's supplemental instruction did not "technically misstate the law," the instruction left uncorrected the confusion the jury conveyed in its question.

24

(*Fleming*, *supra*, 27 Cal.App.5th at p. 766.)  In so doing, the trial court misinstructed the jury.  (See, e.g., *People v. Nero* (2010) 181 Cal.App.4th 504, 518 [trial court misinstructed jury by rereading CALJIC No. 3.00 when jury asked specific question of whether aider and abettor could be guilty of lesser offense].)

### 3.    *Prejudice*

"An instruction that omits or misdescribes an element of a charged offense violates the right to jury trial guaranteed by our federal Constitution, and the effect of this violation is measured against the harmless error test of *Chapman v. California* (1967) 386 U.S. 18, 24 [(*Chapman*)]."  (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165.) *Chapman* requires reversal unless the state can show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  (*Chapman*, *supra*, at p. 24.)  Under *Chapman*, the question "is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand."  (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 (*Sullivan*).)

In this case, despite evidence that is appalling even in Chadhar's own recitation, we are unable to rule out a reasonable doubt that the error contributed to the first degree murder conviction under the prosecution's chosen theory.[9]  This is not a case where the evidence to support the prosecution's chosen theory of first degree murder was overwhelming.  To be sure, a prolonged assault is consistent with premeditation and deliberation, as circumstantial evidence that the killing was methodical and the product of a "preconceived design."  (See *People v. Proctor* (1993) 4 Cal.4th 499, 529-530 [manner of killing supports premeditation and deliberation as killer strangled victim first manually

---

[9] We express no opinion on the availability under section 189 of alternative theories of first degree murder, because the jury was not asked to consider any.

25

then by means of ligature after subjecting victim to prolonged physical abuse].)  And evidence of manual strangulation alone can support an inference of premeditation or deliberation, as the "prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1020.)  Yet a prolonged assault does not compel the conclusion that Chadhar premeditated and deliberated on the decision to kill or that he had the intent to kill throughout the succession of his assaultive acts.  And "[i]t is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation." (*Anderson*, *supra*, 70 Cal.2d at p. 24.)  We acknowledge the ample evidence from which a jury could reasonably infer deliberation, but the existence in the record of sufficient evidence that the killing was willful, deliberate, and premeditated does not demonstrate that the instructional error was harmless beyond a reasonable doubt.  (*Chapman*, *supra*, 386 U.S. at p. 24.)

Neither Jorden nor Haddix opined that strangulation was the sole cause of Watson's death.  Given Jorden's testimony that Watson was alive after at least one bout of strangulation and that she may have been alive upon the last of them, a correctly instructed jury could have found that Chadhar's leaning his full weight on the oar was intended as a coercive, if sadistic, means to extract the "truth" he insisted Watson was withholding from him.[10]  The jury, as instructed, could have reasonably concluded that

---

[10] We are likewise unpersuaded by the prosecution argument that Chadhar's years-long history of abusing Watson compelled a conclusion that he had an intent to kill on this particular occasion.  The jury could as easily have determined that the abusive history reflected a pattern and practice of nonlethal violence that Chadhar intended as a means of enforcing Watson's continued submission and servitude.  Nor does Chadhar's evasiveness to the police or his concealment of evidence such as the oar in the aftermath of Watson's death illuminate on this record his mental state prior to the killing.

Chadhar deliberated only on the decision to beat and strangle Watson, not necessarily his decision to kill her. Although at oral argument the Attorney General maintained that any reasonable jury would have found the element of "deliberation" met once it found that Chadhar intended to kill Watson because of the specific circumstances of the assault in this case, our harmless error inquiry under *Chapman* "is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." (*Sullivan*, *supra*, 508 U.S. at p. 279.) We cannot discount the fact that the jury in this case expressed confusion as to the element of deliberation and specifically the requisite subject of that deliberation. Given the jury's question, we are not persuaded beyond a reasonable doubt that "the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Ibid.*) We accordingly cannot conclude on this record that the error was harmless. (*Chapman*, *supra*, 386 U.S. at p. 24; *People v. Wilkins* (2013) 56 Cal.4th 333, 350-351.)

Because the instruction addressed only the prosecution's sole theory of first degree murder, however, that "[t]he error would not . . . have affected a conviction of the lesser included offense of [second degree murder]." (*People v. Kelly* (1992) 1 Cal.4th 495 (*Kelly*), 528; *People v. Gonzalez* (2018) 5 Cal.5th 186, 197 [second degree murder is a lesser included offense of first degree premeditated murder].) Notwithstanding the instructional error on the element of deliberation for first degree murder, the trial court properly instructed the jury on the elements of implied malice and express malice. The jury's subsequent verdict demonstrated that it found beyond a reasonable doubt that Chadhar killed Watson with malice aforethought, and we see no likelihood for the instructional error to have impacted this finding.

Accordingly, we must reverse the judgment, and on remand, the prosecutor may elect to retry the first degree murder count. (See *Kelly*, *supra*, 1 Cal.4th at p. 528 ["When a greater offense must be reversed, but a lesser included offense could be affirmed, we

27

give the prosecutor the option of retrying the greater offense, or accepting a reduction to the lesser offense."].)  Because we reject Chadhar's other claims of error, *post*, if the prosecutor elects not to retry the first degree murder count, the trial court shall resentence Chadhar for second degree murder.

## B.   *Evidence of Prior Abuse*

Next, Chadhar argues that the trial court erred by admitting evidence of his prior acts of domestic violence against Watson.  Chadhar does not specifically identify what evidence or which witness he believes should have been excluded, "only that, in the aggregate, it was unduly prejudicial."  (*People v. Baker* (2021) 10 Cal.5th 1044, 1100 (*Baker*).)  We therefore examine the admissibility of the prior acts evidence taken as a collective whole.

### 1.   *Legal Principles*

Evidence of prior acts is ordinarily inadmissible to show a defendant's propensity to commit a charged crime.  (Evid. Code, § 1101, subd. (a).)[11]  But as an exception to this customary exclusion of propensity evidence, evidence of prior acts of "domestic violence"—defined broadly to include "abuse" under Family Code section 6200 et seq. if within five years of the instant offense[12]—may be admitted in a criminal prosecution for

---

[11] Undesignated statutory references are to the Evidence Code.

[12] "[T]he plain and unambiguous language of section 1109, subdivision (d)(3), incorporates, in addition to Penal Code section 13700, the Family Code definition of abuse—including the behaviors listed in Family Code section 6230, subdivision (a)(4)—provided that the events occurred within five years of the charging offense."  (*People v. Mani* (2022) 74 Cal.App.5th 343, 360.)  Penal Code section 13700 defines "[a]buse" as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another."  Family Code section 6211 defines " 'abuse' " by reference to Family Code section 6203, which in turn defines "abuse" as including any behavior that has been or can be enjoined under Family Code section 6320.  Family Code section 6320, subdivision (a) includes, among other conduct, harassment and "disturbing the peace of

28

a crime of domestic violence.  (§ 1109.)  Section 1109 "reflects the Legislature's determination that in domestic violence cases, similar prior offenses are uniquely probative of a defendant's guilt on a later occasion."  (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1192.)  "A defendant's pattern of prior acts of domestic violence logically leads to the inference of malice aforethought and culpability for murder." (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1237 (*Brown*).)

Moreover, "[e]ven before the enactment of section 1109, the case law held that an uncharged act of domestic violence committed by the same perpetrator against the same victim is admissible:  'Where a defendant is charged with a violent crime and has or had a previous relationship with the victim, prior assaults upon the same victim, when offered on disputed issues, e.g., identity, intent, motive, et cetera, are admissible based solely upon the consideration of identical perpetrator and victim without resort to a "distinctive modus operandi" analysis of other factors.' "  (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1026 [applying § 1101, subd. (b)].)

Even where otherwise admissible under sections 1109 or 1101, subdivision (b), however, prior acts evidence remains subject to exclusion under section 352 if the probative value of the evidence is substantially outweighed by the risk of unfair prejudice.  (*People v. Foster* (2010) 50 Cal.4th 1301, 1331; *People v. Cole* (2004) 33 Cal.4th 1158, 1194-1195.)  " 'Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt.' "  (*People v. Tran* (2011) 51 Cal.4th 1040, 1048 (*Tran*).)

---

the other party."  Disturbing the peace "includes, but is not limited to, coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty."  (Fam. Code, § 6320, subd. (c).)

The trial court " 'must engage in a careful weighing process under section 352' when admitting propensity evidence." (*Baker*, *supra*, 10 Cal.5th at p.1098.) Thus, " 'trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's [uncharged acts], or excluding irrelevant though inflammatory details surrounding the offense.' " (*Ibid.*, quoting *People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) But the trial court's discretion to admit or exclude evidence under section 352 is broad, and we do not disturb its exercise barring a " 'manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 (*Rodrigues*).)

### 2. *Probative Value of the Evidence: Sections 1109 and 1101*

Chadhar does not argue that the prior acts evidence was categorically inadmissible under sections 1101, subdivision (b) or 1109; rather, he argues that "the prior relationship evidence did not have substantial probative value as to the issues in this case" and that "[e]ven for [the] broad purpose [outlined in section 1109], the evidence had little probative value." Thus, Chadhar's argument is primarily one that the trial court abused its discretion in declining to exclude the evidence under section 352. We nonetheless address threshold issue of admissibility under sections 1109 and 1101 to gauge the legitimate probative value of the evidence.

Chadhar argues that the trial court abused its discretion by admitting the prior acts evidence, in that his concession that he killed Watson limited the issues in dispute so as to leave his prior history of abuse "no or low probative value" under sections 1101,

30

subdivision (b), and 1109.[13]  Implicit in Chadhar's argument, however, is the

presumption that the narrow range of what he elected to dispute at trial is or should be

dispositive of what the prosecution may present in its case-in-chief.  But " 'the

prosecution may not be compelled to accept a stipulation where the effect would be to

deprive the state's case of its persuasiveness and forcefulness.' [Citation.]" (*People v.

Valdez* (2012) 55 Cal 4th 82, 130.)  That the necessity for such persuasive proof may, as a

purely practical matter, have been lessened by Chadhar's concessions goes only to the

balancing of factors under section 352, not whether it was relevant to the continuing

disputes as to Chadhar's subjective motive, intent, and propensity to commit murder.

The prior acts, though extensive, were limited to Chadhar's acts against Watson, not

unrelated domestic violence against family members.  As delimited by the court, the prior

acts admitted were highly probative of the relationship dynamic in which Chadhar

ultimately killed Watson.  They established Chadhar's propensity under section 1109 for

unprovoked sexual jealousy, rage over imagined slights, and consistent enforcement of

his dominance over Watson—all characteristics relevant to his state of mind at the time

he killed her.  Independent of Chadhar's propensities, the prior acts evidence was also

probative, under section 1101, subdivision (b), of his dissatisfaction with the

relationship—a potential motive to kill with express malice and with premeditation and

---

[13] As for the trial court's admission of Ferry's expert testimony on intimate partner violence generally, Chadhar argues only that the exclusion of the prior acts evidence would have made Ferry's testimony irrelevant.  We therefore understand Chadhar to make no claim that the admission of Ferry's testimony allowed the jury to find prior abuse based upon Watson's behavior and the extent to which her behavior resembled the victim profile of "toxic hope" and "traumatic bonding."  Even if Chadhar had advanced such a claim, however, we note that the prior acts evidence was sufficiently comprehensive, detailed, and consistent that an abuse of discretion in admitting Ferry's testimony cannot be said to have been prejudicial precisely because it was so unnecessary to the jury's determination of malice and the absence of provocation or accident on this record.

deliberation.[14] (See *Brown*, *supra*, 192 Cal.App.4th at p. 1237 ["[a] defendant's pattern of prior acts of domestic violence logically leads to the inference of malice aforethought and culpability for murder"]; *People v. Cage* (2015) 62 Cal.4th 256, 274 [prior incidents of abuse were important evidence of motive, and was probative of material issues of identity, intent, premeditation and deliberation]; *People v. Kovavich* (2011) 201 Cal.App.4th 863, 893 [holding that " 'quarrels, antagonism, or enmity between an accused and the victim of a violent offense is proof of motive to commit the offense' "].) The prior acts further established Watson's custom and habit of hypervigilant efforts to allay his irrational suspicions—even at the cost of the employment on which the family depended—and her consistent avoidance of provocation, which could be considered a habit or custom admissible under section 1105.

The "frequency, regularity, and severity" of the prior domestic abuse "infuses [the] propensity evidence with probative strength." (*People v. Kerley* (2018) 23 Cal.App.5th 513, 536 (*Kerley*).) As all the prior acts evidence involved Chadhar's control over and abuse of Watson, the probative value was increased: it is undisputed that Chadhar's murder of Watson was an act of domestic violence. (See *Brown*, *supra*, 192 Cal.App.4th at p. 1237.) Indeed, the legislative history of section 1109 reflects the

---

[14] To the extent Chadhar contends his prior history of abusing Watson is insufficiently similar to this homicide, he underestimates the capaciousness of section 1101, subdivision (b). On the issue of motive, no degree of similarity is needed, "so long as the offenses have a direct logical nexus." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15.) The trial court was well within its discretion to find the requisite logical nexus between the witness accounts—of Chadhar's intrusive monitoring of Watson, his chronic suspicions of infidelity, and his resort to physical punishment when he disbelieved her protestations of innocence—and Chadhar's motive to abuse Watson the day he killed her. "[D]issimilarity alone does not compel exclusion" of otherwise admissible propensity evidence. (*People v. Cordova* (2015) 62 Cal.4th 104, 133.) And Chadhar also overlooks the critical commonality linking the prior acts evidence with the charged offense—same victim, same reported dynamic of domineering jealousy, same reported volatility.

Legislature's understanding that "in domestic violence cases in particular, a history or pattern of domestic violence is very probative." (*Kerley*, *supra*, at p. 535.)

Chadhar, however, claims that any inference that he was disposed to commit domestic abuse had no or little logical tendency to show that he killed with malice, premeditation, or deliberation. In part, Chadhar relies on *People v. Williams* (2018) 23 Cal.App.5th 396, for the proposition that a broad "domestic violence" or "troubled marriage" theory is insufficient to show intent when the former acts shed no light on the defendant's intent on committing the latter act. *Williams*, however, is inapposite. Unlike this case, the defendant's 23-year-old prior shooting of his then-mother-in-law in *Williams* (18 years before his schizoaffective disorder diagnosis) bore little resemblance to the stabbing of his new wife when he was mixing methamphetamine with his medications. (*Id.* at pp. 402, 405-406.) The victims of the prior act and the charged offense in *Williams* were unrelated, the prior offense was remote in time, and the overall circumstances rendered it such that it would not permit a factfinder to infer anything about the defendant's state of mind when he committed the charged offense. (*Id.* at pp. 418-419.) In contrast, the prior acts evidence in this case uniformly were prior acts of domestic violence Chadhar perpetrated against Watson. And Chadhar's history of domestic violence against Watson was susceptible to a host of potentially adverse inferences, one of which was an inference that when he beat and assaulted her to her death, he did so with express malice, for example, or attacked wholly without provocation, contrary to his claims. (*Brown*, *supra*, 192 Cal.App.4th at p. 1237.) These are of course not the only available inferences: a jury could as readily infer from the prior acts evidence that Chadhar intended his abuse to be chronically and persistently calibrated to maintain nonlethal if brutal dominance over a spouse committed to meeting his every whim. But the most adverse inference need not be compulsory for prior acts evidence to be admitted: as the jury here was advised, if it found that Chadhar committed

33

the uncharged acts of domestic violence, it "may" but "was not required to conclude . . . that [he] was disposed or inclined to commit domestic violence . . . ."

### 3. ***Undue Prejudice***

Given the probative value of the prior acts evidence, we examine the trial court's countervailing consideration of the risk of undue prejudice. Although the court's statement of its ruling was terse, Chadhar does not assert that the trial court in its section 352 analysis considered any improper factor or failed to consider any proper one. Nor do we in our review of the record detect a basis to question the trial court's exercise of its broad discretion.

We acknowledge the sheer volume of prior acts evidence in this case—Watson's former coworkers testified over the course of three days, and many text messages was introduced into evidence—and the fact that Chadhar had never before been convicted of domestic violence, which increases the prejudicial effect of the evidence. (*Tran*, *supra*, 51 Cal.4th at p. 1047 [noting that "the prejudicial effect of the evidence is increased if the uncharged acts did not result in a criminal conviction"].) And we agree that there may have been less prejudicial alternatives to the wholesale admission of all the prior relationship evidence—for example, some of the witnesses that provided more cumulative testimony could have been excluded. (*Baker*, *supra*, 10 Cal.5th at p. 1098 [availability of potentially less prejudicial alternatives a factor to consider in section 352 analysis].)

However, to demonstrate error under section 352, Chadhar must show that the trial court abused its discretion by admitting evidence where its probative value has been "*substantially* outweighed by the probability that is admission will . . . create substantial danger of undue prejudice." (§ 352, italics added; *Baker*, *supra*, 10 Cal.5th at p. 1100.) And here, Chadhar's claim fails: certainly, the prior acts evidence undermines Chadhar's claim of provocation, accident, mistake, or lack of propensity, but "prejudic[ial]" as used

34

in section 352 is not synonymous with damaging. (*People v. Doolin* (2009) 45 Cal.4th 390, 439 (*Doolin*).) A trial court viewing the evidence as a whole—including Chadhar's own account of marital relations and of his attack on Watson the morning of her death—could reasonably conclude that evidence of Chadhar's alleged past abuse of Watson did not " ' " 'uniquely tend[] to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " (*Ibid.*) Accordingly, we conclude that the trial court did not err in declining to exclude the evidence based on its significant probative value and its limited potential for prejudice. (*Baker*, *supra*, 10 Cal.5th at p. 1100; *Rodrigues*, *supra*, 8 Cal.4th at pp. 1124-1125.)

We note, moreover, that none of the prior acts were particularly stale—the evidence that was admitted concerned Chadhar's alleged domestic violence against Watson during their marriage beginning in 2011, which encompassed the roughly six years that immediately preceded Watson's death. The nature and relevance of the domestic violence was also, as we have stated, particularly pertinent to the disputed issue of intent and motive at trial. (*Brown*, *supra*, 192 Cal.App.4th at p. 1237.)

We likewise find no basis to disturb the trial court's implicit determination that evidence of Chadhar and Watson's relationship would not serve to detract or confuse the jury from their "main inquiry"—her killing and, correspondingly, Chadhar's mental state at the time he killed her. (*Baker*, *supra*, 10 Cal.5th at p. 1098.) Relatedly, the evidence of Chadhar's prior acts was not significantly more inflammatory than the charged crime, even as recounted by Chadhar. (*Tran*, *supra*, 51 Cal.4th at p. 1047 [potential for prejudice decreased "when testimony describing the defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense"].) Moreover, as to the degree of certainty with which the prior acts occurred, the trial court was entitled to infer that "the overwhelming volume and consistency of the domestic violence testimony made for compelling evidence that it was true." (*Kerley*, *supra*, 23

35

Cal.App.5th at p. 537.)[15]  And finally, to the extent Chadhar argues that the number of witnesses made his trial preparation significantly burdensome, we acknowledge the relevance of this factor to a determination of prejudice.  (*Baker*, *supra*, 10 Cal.5th at p.1098 [burden on defendant is relevant to prejudice analysis].)  But none of the prior acts were significantly remote in time or location, and nothing in the record suggests that investigation or cross-examination of the witnesses proved onerous in disproportion to the issues in dispute.

Accordingly, Chadhar's claim that the trial court abused its discretion when it did not exclude some evidence of his prior domestic violence fails—certainly, the prior acts evidence undermines Chadhar's case, but "prejudic[ial]" as used in section 352 is not synonymous with damaging.  (*Doolin*, supra, 45 Cal.4th at p. 439.)  Ultimately, his argument on appeal invites us to substitute our judgment for that of the trial court.  Although another reasonable trial judge might have imposed more stringent limits on the number of witnesses called, or the age of prior acts admitted, nothing in the record compels a conclusion that the trial court exceeded the bounds of reason in admitting the evidence.  Given the probative value of the prior acts evidence and the disturbing evidence before the jury even without the prior acts, we will not second-guess the trial court's balancing of factors and determination that the prior acts evidence was not unduly prejudicial.  (*Baker*, *supra*, 10 Cal.5th at p. 1098; *Falsetta*, *supra*, 21 Cal.4th at p. 917.)[16]

---

[15] We also observe that the jury here was instructed with a modified version of CALCRIM No. 375 on the limited use of prior uncharged acts.  Specifically, the court duly instructed that the jury was to consider evidence of uncharged offenses only as to specified issues under section 1101, subdivision (b) and only if the prosecution had proved by a preponderance of the evidence that Chadhar did in fact commit the offenses.

[16] In his opening brief, Chadhar argues that the prosecutor's "threat" to call N. to testify about her parents' relationship was a "reprehensible tactic" and did not make the evidence any more probative or less prejudicial.  There being nothing in the record to

36

Given our conclusion that the trial court did not abuse its broad discretion under section 352, we need not address Chadhar's claim that the admission of the evidence violated his right to due process.  (See, e.g., *People v. Mani* (2022) 74 Cal.App.5th 343, 376 ["Where, as here, the trial court does a proper analysis under Evid. Code, § 352, there is no due process violation."]; *Falsetta*, *supra*, 21 Cal.4th at pp. 917-918 [holding that § 352 prevents admissibility of propensity evidence under § 1108 from triggering due process concerns].)

## C. Brady *Violation*

Next, Chadhar argues the judgment must be reversed because the prosecutor failed to disclose evidence under *Brady*, *supra*, *3*73 U.S. 83 and Penal Code section 1054.1 that could have been used to impeach Dr. Jorden.  Two memoranda prepared by the district attorney's office, discovered by the defense after the jury had already begun its deliberations, discussed Jorden's work as a forensic pathologist, with one memorandum summarizing that Jorden had previously described herself as "an advocate for victims."  Although the defense vigorously disputed aspects of Jorden's testimony, the scope of that disputed testimony was narrow—limited as it was to the possible means by which Chadhar caused the laceration to Watson's heart and the relative likelihood that Chadhar continued strangling Watson until she died.  Given the narrow scope of disagreement, Chadhar's own testimony, and the extent to which the defense was able to impeach Jorden without the memos, we conclude that the withheld evidence, though favorable to Chadhar, is not material under *Brady* to his guilt.

---

indicate that the trial court considered the prospect of N.'s testimony in its analysis under section 352, we do not consider it.

### 1.    *Background*

In moving for a new trial, the defense argued in part that the prosecutor had violated his duty to disclose material evidence under *Brady*.  Defense counsel characterized Jorden as "[*t*]*he* critical witness" for the prosecution at trial because she gave two opinions essential to the prosecution's theory of the case:  (1) that the heart laceration was the result of indirect forces and not CPR, and (2) it was reasonably possible that the application of force on Watson's neck continued until she died.  Defense counsel noted that Supervising Deputy District Attorney Brian Welch had authored memoranda "documenting Dr. Jorden's bias, including her own admission of bias, that she sees herself as an advocate for the victim" (Jorden memos), which impinged on her credibility.  The prosecutor opposed the motion, arguing that the Jorden memos were privileged attorney work-product and were not exculpatory.

The redacted Jorden memos attached to the motion for a new trial described Welch's observations of Jorden's performance as a forensic pathologist in several criminal matters.  The redacted version of the first Jorden memo, dated October 2012, described Jorden's work on a sexual assault and homicide case involving a child victim, where Jorden was "angry" with investigators who were initially reluctant to accept her conclusion that the death was a homicide.  Jorden reportedly "stressed that she sees herself as an advocate for victims."  The redacted version of the second Jorden memo, dated January 2019, "does not further expand on the original memo" outlining Jorden's work on the child homicide case.  Both memoranda were heavily redacted with multiple paragraphs blacked out.[17]

---

[17] At the hearing on the motion, defense counsel indicated that the trial court had since been supplied a second copy of the Jorden memos, which in this iteration were less heavily redacted than the one in the defense's possession.

After an in camera hearing on the prosecution's claim of attorney work-product, the trial court determined that the Jorden memos "contained substantial amounts of protected work-product information," but there was also information that was not work product and that the second, less heavily-redacted memos should be disclosed to the defense and admitted into evidence for consideration of the new trial motion.[18] Ultimately, after hearing the parties' arguments and Welch's further testimony, the trial court concluded that the prosecutor did not commit a *Brady* violation and denied the motion for a new trial. The trial court, however, noted that Jorden testified at trial that she was a member of a "child abuse prevention council" and mentioned she was on a "domestic violence homicide team," which may have already indicated her potential biases.

### 2. *Legal Principles*

Pursuant to *Brady* and its progeny, the accused's constitutional right to due process of law requires the prosecution to disclose evidence that is " 'favorable to [the] accused' and 'material to either guilt or punishment.' " (*Association for Los Angeles Deputy Sheriffs v. Superior Court* (2019) 8 Cal.5th 28, 40 (*Los Angeles Deputy Sheriffs*) [quoting *Brady*, *supra*, 373 U.S. at p. 87]; *People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 709.) "Such disclosure may be required even if the prosecutor is not personally aware that the evidence exists." (*Los Angeles Deputy Sheriffs*, *supra*, 8 Cal.5th at p. 36.) "[F]avorable" evidence includes evidence that would impeach a

---

[18] This second redaction of the memos was omitted from the record on appeal, and the trial court clerk certified that the exhibits could not be located despite a diligent search. We accordingly granted Chadhar's motion to augment the record with the redacted memos that were submitted in connection with another case before this court, *People v. Deleoz* (2022) 80 Cal.App.5th 642 (*Deleoz*), which version counsel attests is identical to the one now lost. We have also granted Chadhar's motion for judicial notice of the unredacted Jorden memos, which were part of the record on appeal in *Deleoz*.

prosecution witness. (*Id.* at p. 40.) "Evidence is material ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' [Citation.] Evaluating materiality requires consideration of the collective significance of the undisclosed evidence [citation], as well as 'the effect of the nondisclosure on defense investigations and trial strategies [citation]. [Citations.] 'A reasonable probability does not mean that the defendant "would more likely than not have received a different verdict with the evidence," only that the likelihood of a different result is great enough to "undermine[] confidence in the outcome of the trial." ' [Citation.]" (*Ibid.*; see also *Deleoz*, *supra*, 80 Cal.App.5th 642, 656.)

Additionally, California law requires that the prosecuting attorney disclose "[a]ny exculpatory evidence" (Pen. Code, § 1054.1, subd. (e)) and "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial" (*id.*, subd. (f)) if such material "is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies." (Pen. Code, § 1054.1.) Certain privileged material including attorney work-product are excluded from disclosure. (*Id.*, § 1054.6.)

" ' "Because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is reversible without need for further harmless-error review." ' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 668.) In contrast, "[a] violation of the reciprocal discovery obligations constitutes reversible error only where it is reasonably probable, by state[-]law standards, that the omission affected the trial result." (*Deleoz*, *supra*, 80 Cal.App.5th at p. 658.)

Here, Chadhar first raised the *Brady* issue in the context of his new trial motion. Thus on appeal, "[w]e independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by

substantial evidence." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176 (*Letner and Tobin*); see also *People v. Wilson* (2020) 56 Cal.App.5th 128, 160.)

### 3. *Review of the Sealed Transcript and Sealed Memoranda*

Preliminarily, Chadhar requests that this court review the sealed transcript of the in camera hearing to determine whether additional information should have been released to the defense. We have reviewed both the sealed transcript of the in camera hearing as well as the entirety of the unredacted Jorden memos.

To the extent the Jorden memos contain the assistant district attorney's "impressions and opinions about Jorden's interactions with law enforcement and her evaluation of the evidence in those cases, those comments constitute core attorney work product and are excluded from discovery" under Penal Code section 1054.6. (*Deleoz, supra*, 80 Cal.App.5th at p. 661.) Likewise, the portions of the Jorden memos that contain case-specific information about specified death investigations, including the details of the police investigation, witness statements, and Jorden's autopsy notes, are not generally exculpatory under section Penal Code section 1054.1, subdivision (e) because they do not tend to exonerate Chadhar. (*Deleoz, supra*, 80 Cal.App.5th at p. 662.) Thus, the trial court properly did not disclose those details to the defense.

There are, however, portions of the memoranda that were not disclosed to the defense that contain "statements or reported statements" made by Jorden that could be construed as favorable to the defense under Penal Code section 1054.1. These statements show that Jorden sometimes shifted her diagnosis based on changing information and may have omitted some information as to her conclusions about certain causes of death, which can conceivably be used as impeachment evidence by Chadhar. (See *Deleoz, supra*, 80 Cal.App.5th at p. 662.)

Accordingly, we assume that additional information from the Jorden memos should have been disclosed to the defense and turn to whether the information withheld

41

was material under *Brady*—whether it is reasonably probable that the nondisclosure affected Chadhar's conviction. (See *Deleoz*, *supra*, 80 Cal.App.5th at pp. 662-663.) And, likewise, whether the failure to disclose the information under Penal Code section 1054.1 was reversible error under *Watson*—that it is reasonably probable that its omission affected the trial. (*Deleoz*, *supra*, 80 Cal.App.5th at p. 658.)

### 4. *Materiality*

Chadhar himself conceded that he killed Watson, leaving as the primary issue at trial his state of mind and degree of criminal culpability. Because we have concluded that Chadhar's conviction of first degree murder must be reversed on the independent ground of the trial court's instructional error, we examine the materiality of the Jorden memos to Chadhar's culpability for second degree murder rather than manslaughter, specifically the existence of malice aforethought. (Pen. Code, § 192; *People v. Lasko* (2000) 23 Cal.4th 101, 108 (*Lasko*) [manslaughter is unlawful killing of a human being without malice].) Express malice requires an intent to kill, whereas implied malice requires " 'an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*Lasko*, *supra*, at p. 107.) Thus, our analysis focuses on the potential impact of the Jorden memos on the jury's finding of malice—as opposed to a killing without malice. We view the materiality of the Jorden memos after "considering the collective evidence presented at trial." (*Deleoz*, *supra*, 80 Cal.App.5th at p. 666.)

Based on our review of the record, we are not persuaded that the provision of the Jorden memos and the potential impeachment evidence contained therein would have created a reasonable probability of a different result. (*Los Angeles Deputy Sheriffs*, *supra*, 8 Cal.5th at p. 40.) Preliminarily, we note Chadhar's own account of having twice exerted the full weight of his body down onto the metal oar against the front of Watson's

42

neck as a means of inducing her to produce the answers he demanded: we are hard pressed to imagine the jury reconciling his testimony in this regard with anything less than implied malice, irrespective of Jorden's testimony. Moreover, much of Jorden's testimony the defense did not dispute—the extent and nature of the injuries, and the ultimate cause of death. What was disputed were Jorden's opinions as to (1) whether administration of CPR could have caused the heart laceration and (2) whether the strangulation continued until Watson died. Even assuming that disclosure of the Jorden memos would conclusively resolve both these discrete issues in favor of the defense, neither resolution would undermine the inference of implied malice that Chadhar's account of his actions supports.

At bottom, what is undisputed is that Chadhar severely beat and strangled Watson, killing her. Nothing in the narrow debate between the experts suggests that the further impeachment of Jorden could likely have swayed the jury to deem Watson's death anything less than the product of implied malice. (See *Letner and Tobin*, *supra*, 50 Cal.4th at p. 177 [impeachment evidence has been found material " ' "where the likely impact on the witness's credibility would have undermined an element of the prosecution's case" ' "].) Chadhar has failed to carry his burden to establish the materiality of the evidence under *Brady*. And for these same reasons, assuming a violation of Penal Code section 1054.1, any error was not prejudicial. (*Deleoz*, *supra*, 80 Cal.App.5th at p. 658.)

### III. DISPOSITION

The judgment is reversed. On remand, the prosecutor may elect to retry the first degree murder count. If the prosecutor elects not to retry the first degree murder count, the trial court shall enter a conviction for second degree murder and resentence defendant accordingly.

43

_____

LIE, J.

WE CONCUR:

_____

DANNER, ACTING P.J.

_____

BROMBERG, J.

*People v. Chadhar*
H047641